# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANTHONY GESTAIL TUCKER,

Defendant-Appellant.

FOR PUBLICATION
October 15, 2015
9:05 a.m.

No. 322151
Oakland Circuit Court
LC No. 2012-242851-FH

---

Before: HOEKSTRA, P.J., and JANSEN and METER, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted[1] his no contest plea convictions of felonious assault, MCL 750.82, and domestic violence, MCL 750.812. Defendant was sentenced, as a second habitual offender, MCL 769.10, to 119 days, time served, for the felonious assault conviction and 93 days, time served, for the domestic violence conviction. Defendant was also required to register as a sex offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. We affirm.

## I. BACKGROUND

Defendant was convicted in 1990 of assault with intent to commit criminal sexual conduct involving penetration, MCL 750.520g(1). He was sentenced to three years' probation and was discharged in 1993. On October 1, 1995, SORA went into effect. Although assault with intent to commit criminal sexual conduct involving penetration is a "listed offense" requiring registration, MCL 28.722(w)(*iv*), defendant was not required to register because he was discharged from probation before the registry went into effect, MCL 28.723(1). In 2011, the Legislature amended SORA, 2011 PA 17, to include the following "recapture" provision, codified at MCL 28.723(1)(e):

---

[1] See *People v Tucker,* unpublished order of the Court of Appeals, entered July 3, 2014 (Docket No. 322151).

-1-

(1) Subject to subsection (2), the following individuals who are domiciled or temporarily reside in this state or who work with or without compensation or are students in this state are required to be registered under this act:

* * *

(e) An individual who was previously convicted of a listed offense for which he or she was not required to register under this act, but who is convicted of any other felony on or after July 1, 2011.

On October 8, 2013, defendant pleaded no contest to felonious assault, MCL 750.82, and domestic violence, MCL 750.81(2), under a *Cobbs*[2] agreement under which he would be sentenced to time served. At sentencing, the trial court told defendant that he would be required to register as a sex offender under MCL 28.723(1)(e)[3] and gave defendant the opportunity to withdraw his plea. Defendant declined. Defendant was required to register for life as a "Tier III" offender.

Defendant then filed a motion to correct an invalid sentence in order for the trial court to remove him from the SORA registry, arguing that the registration requirement violated the state and federal Ex Post Facto Clauses, the federal Cruel and Unusual Punishment Clause, and the state Cruel or Unusual Punishment Clause. The trial court denied the motion and determined that defendant was required to register under the terms of the law.

## II. EX POST FACTO CLAUSES

Defendant first contends that the requirement that he register as a sex offender under SORA violates the Ex Post Facto Clauses of the state and federal Constitutions. We disagree.

We review de novo issues of constitutional law. *People v Temelkoski*, 307 Mich App 241, 246; 859 NW2d 743 (2014). The United States and Michigan Constitutions prohibit ex post facto laws. *People v Callon*, 256 Mich App 312, 316-317; 662 NW2d 501 (2003), citing US Const, art 1, § 10; Const 1963, art 1, § 10. This Court has declined to interpret the Ex Post Facto Clause of the Michigan Constitution to afford broader protection than its federal counterpart. *Id*. at 317. All laws that violate ex post facto protections exhibit the same two elements: "(1) they attach legal consequences to acts before their effective date, and (2) they work to the disadvantage of the defendant." *Id*. at 318. "The critical question [for an ex post facto violation] is whether the law changes the legal consequences of acts completed before its effective date." *Id*. (citations and quotation marks omitted; alteration in *Callon*; emphasis omitted). This Court has identified four circumstances that implicate the Ex Post Facto Clauses:

---

[2] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

[3] Defendant was required to register under MCL 28.723(1)(e) because of his felonious assault conviction, which is a felony. See MCL 750.82(1). His domestic violence conviction is a misdemeanor conviction. MCL 750.81(2).

A statute that affects the prosecution or disposition of criminal cases involving crimes committed before the effective date of the statute violates the Ex Post Facto Clauses if it (1) makes punishable that which was not, (2) makes an act a more serious criminal offense, (3) increases the punishment, or (4) allows the prosecution to convict on less evidence. [*Riley v Parole Bd*, 216 Mich App 242, 244; 548 NW2d 686 (1996).]

In this case, the third circumstance is at issue, as defendant argues that his registration as a sex offender has increased the punishment for his 1990 conviction. Plaintiff counters that MCL 28.723(1)(e) cannot constitute an ex post facto law because it attaches legal consequences to defendant's 2013 convictions, not his 1990 conviction.

We find caselaw on recidivist statutes helpful in answering this question. As a general matter, " 'recidivist statutes . . . do not change the penalty imposed for the earlier conviction.' " *People v Reichenbach*, 459 Mich 109, 124-225; 587 NW2d 1 (1998), quoting *Nichols v United States*, 511 US 738, 747; 114 S Ct 1921; 128 L Ed 2d 745 (1994). *Callon* is instructive in this regard. The defendant in *Callon* was convicted of impaired driving, MCL 257.625(3), in 1993. *Callon*, 256 Mich App at 315. On October 9, 1999, he was arrested for operating a vehicle under the influence of intoxicating liquors or while having a blood alcohol content of 0.10 grams or more per 100 milliliters of blood (OUIL/UBAL), MCL 257.625(1). *Id*. at 314. During the period between the two offenses, the Legislature amended the pertinent statute so that a previous impaired-driving conviction could be used to enhance a subsequent OUIL/UBAL conviction. *Id*. at 315-316. This Court rejected the defendant's ex post facto challenge to this enhancement, holding that the amendment to the statute had not altered the legal consequences of his 1993 conviction, but rather altered the legal consequences of his 1999 conviction. *Id*. at 318. This Court explained, "[T]he conduct for which defendant is being punished is driving while intoxicated or with an unlawful blood alcohol level after having fair notice that the statute had been amended to permit enhancement of an OUIL/UBAL conviction with a prior impaired-driving conviction." *Id*. at 319. This Court concluded, "Simply put, there is no retroactive application of the law where a prior conviction is used to enhance the penalty for a new offense committed after the effective date of the statute." *Id*. at 321.

In this case, although MCL 28.723(1)(e) is not a traditional recidivist statute, the reasoning of *Callon* applies nonetheless. Defendant's registration was not required until he committed another felony in 2013. His 1990 conviction was used to enhance the consequences of his 2013 felony, which was committed after the effective date of the statute. This would be a different case if on July 1, 2011, the effective date of MCL 28.723(1)(e), defendant had been immediately required to register as a sex offender because of his 1990 conviction alone. Rather, defendant is required to register in connection with the 2013 felony. Defendant's registration in this case is inextricably tied to his 1990 conviction. But this does not lead to the conclusion that new legal consequences have been added to that conviction. In *Callon*, the enhancement was similarly tied to the defendant's preceding impaired-driving conviction, but the consequences were added to his subsequent OUIL/UBAL offense. See *Callon*, 256 Mich App at 319.

Therefore, the recapture provision found in MCL 28.723(1)(e) does not violate the Ex Post Facto Clauses of the state and federal Constitutions.[4]

## III. CRUEL OR UNUSUAL PUNISHMENT

Defendant next argues that requiring him to register as a sex offender constitutes cruel or unusual punishment. We disagree.

As stated above, we review de novo issues of constitutional law. *Temelkoski*, 307 Mich App at 246. Defendant, as the party challenging SORA, bears the burden of proving that it is unconstitutional. *Id*. at 247.

Article I, § 16 of the Michigan Constitution prohibits the infliction of cruel or unusual punishment.[5] A threshold question in this case, of course, is whether registration constitutes punishment at all. See *Temelkoski*, 307 Mich App at 250-251. We have repeatedly held that sex offender registration does not constitute punishment because the registry is designed to protect the public rather than punish the offender. *Id*. at 250-271; *People v Golba*, 273 Mich App 603, 615-621; 729 NW2d 916 (2007); *People v Pennington*, 240 Mich App 188, 191-197; 610 NW2d 608 (2000).[6] But defendant posits an argument that we have not yet addressed. He argues that in

---

[4] Amicus argues that defendant's registration as a sex offender violates the Ex Post Facto Clauses as applied to him. However, the United States Supreme Court has held that ex post facto challenges cannot be brought on an as-applied basis. *Seling v Young*, 531 US 250, 263; 121 S Ct 727; 148 L Ed 2d 734 (2001). Therefore, we reject amicus's argument.

[5] The Eight Amendment of the United States Constitution prohibits the infliction of cruel *and* unusual punishment. US Const, Am VIII. The state constitutional provision is interpreted more broadly than the federal provision, and therefore if a particular punishment "passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *People v Nunez*, 242 Mich App 610, 618 n 2; 619 NW2d 550 (2000).

[6] One exception was *People v Dipiazza*, 286 Mich App 137; 778 NW2d 264 (2009). In that case, the defendant, aged 18, had a consensual sexual relationship with NT, "who was nearly 15 years old." *Id*. at 140. NT's parents "knew of the relationship and condoned it." *Id*. at 154. The defendant and NT subsequently married. *Id*. The defendant pleaded guilty to attempted third-degree criminal sexual conduct, MCL 750.92; MCL 750.520d(1)(a), and was placed on youthful trainee status under the Holmes Youthful Trainee Act (HYTA), MCL 762.11 *et seq*., on August 29, 2004. *Id*. at 140. Under SORA as it existed at that time, the defendant was required to register as a sex offender. *Id*. However, under amendments to SORA that went into effect on October 1, 2004, if the defendant had been placed on HYTA status on or after October 1, he would not have been required to register as a sex offender. *Id*. at 141. The defendant was successfully discharged from HYTA status and petitioned to be removed from the sex offender registry. *Id*. at 140. This Court held that the defendant's registration as a sex offender constituted cruel or unusual punishment as applied to him. *Id*. at 156. In 2011, however, SORA was amended to include "a consent exception . . . that provides some youthful offenders relief in situations involving consensual sex acts." *Temelkoski*, 307 Mich App at 261. The *Temelkoski*

-4-

light of recent amendments that have added to the requirements of sex offender registration, it now constitutes punishment. He specifically draws our attention to school safety zones and in-person reporting requirements. We take this opportunity to address the constitutionality of these provisions.

## A. HISTORY OF SORA

SORA first went into effect on October 1, 1995. *People v Dipiazza*, 286 Mich App 137, 142; 778 NW2d 264 (2009). It has been amended 20 times since. See 2014 PA 328; 2013 PA 2; 2013 PA 149; 2011 PA 18; 2011 PA 17; 2006 PA 46; 2006 PA 402; 2005 PA 121, 2005 PA 123, 2005 PA 127, 2005 PA 132, 2005 PA 301; 2005 PA 322; 2004 PA 237, 2004 PA 238; 2004 PA 240; 2002 PA 542; 1999 PA 85; 1996 PA 494; 1995 PA 10.[7] These amendments have generally made registration more intrusive and onerous for registrants. Defendant argues that these successive amendments have turned what was originally only a law enforcement tool into a punishment for the offenders. We do not attempt to catalogue every amendment to SORA but only those that are most relevant to the resolution of the questions before us.

The sex offender registry as it first existed in 1995 was not public and was accessible only by law enforcement. *Dipiazza*, 286 Mich App at 142. Offenders were required to register for 25 years for their first offense and for life for a second or subsequent offense committed after October 1, 1995. MCL 28.725(3) and (4), as enacted by 1994 PA 295. In 1996, limited public inspection was allowed. MCL 28.730(2), as added by 1996 PA 494. Police agencies were required to make registry information for the zip codes within their jurisdiction "available for public inspection during regular business hours." *Id*.

In 1999, the registry became available to the public through the Internet. MCL 28.728(2), as amended by 1999 PA 85; *Dipiazza*, 286 Mich App at 142-143. The amendment also added more "listed offenses" requiring registration. MCL 28.722(d), as amended by 1999 PA 85. Further, a "catch-all" provision was added, which included as a listed offense "[a]n offense substantially similar to" a listed offense. MCL 28.722(d)(*xiii*), as added by 1999 PA 85. The amendment also provided that persons convicted of certain offenses would be required to register for life. MCL 28.725(7), as added by 1999 PA 85. Finally, offenders were now required to report in person to verify their domicile or residence. MCL 28.725a, as added by 1999 PA 85.

In 2002, SORA was amended to require sex offenders who are students or employees at institutions of higher education to register with the law enforcement agency with jurisdiction over the institution's campus. MCL 28.724a, as added by 2002 PA 542. A registrant's status as a student or employee at such an institution became included on the registry. MCL 28.728(3)(b),

---

Court held that in light of these amendments, the analysis in *Dipiazza* was "outdated." *Id*. at 258.

[7] Defendant refers in his brief to the "legislative history" of these changes as purportedly recounted in the legislative analyses. But our Supreme Court has stated that such staff-prepared analyses are of little value in interpreting statutes and "[i]n no way can . . . be said to officially summarize the intentions of" the Legislature. *In re Certified Question from the United States Court of Appeals for Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003).

as added by 2002 PA 542. The 2002 amendment also included a statement of legislative purpose:

> The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger. [MCL 28.721a, as added by 2002 PA 542.]

In 2004, registrants were first required to pay a $35 "registration fee." MCL 28.725a(6), as added by 2004 PA 237. Another 2004 amendment required that photographs of registrants be added to the registry. MCL 28.728(3)(c), as added by 2004 PA 238.

In 2005, SORA was amended to create "student safety zones," defined as "the area that lies 1,000 feet or less from school property." MCL 28.733(f), as added by 2005 PA 121. Offenders were generally precluded from residing within school safety zones. MCL 28.735(1), as added by 2005 PA 121. This preclusion did not apply if the offender was residing within a student safety zone when the act was enacted into law. MCL 28.735(3)(c), as added by 2005 PA 121.[8] Otherwise, an offender was required to "change his or her residence to a location outside the student safety zone not more than 90 days after he or she is sentenced for the conviction that gives rise to the obligation to register." MCL 28.735(4), as added by 2005 PA 121.

Another amendment in 2005 precluded offenders from working or loitering within student safety zones. MCL 28.734, as added by 2005 PA 127. "Loiter" was defined as "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." MCL 28.733(b), as added by 2005 PA 121. This subsection likewise did not apply to a sex offender working within student safety zones when the act was enacted into law, MCL 28.734(3)(a), as added by 2005 PA 127, or to a sex offender "whose place of employment is within a student safety zone solely because a school is relocated or is initially established 1,000 feet or less from the individual's place of employment," MCL 28.734(3)(b), as added by 2005 PA 127.[9] In 2006, the public became eligible to receive notifications when persons in their zip code were required to register as sex

---

[8] This exception did not apply "to an individual who initiates or maintains contact with a minor within that student safety zone." MCL 28.735(3)(c), as added by 2005 PA 121.

[9] Again, these exceptions did not apply "to an individual who initiates or maintains contact with a minor within that student safety zone." MCL 28.734(3)(a) and (b), as added by 2005 PA 127.

offenders or when registered sex offenders moved their residences to that zip code. MCL 28.730(3), as amended by 2006 PA 46.

In 2011, SORA underwent what defendant characterizes as a "sweeping overhaul." The recapture provision was added. MCL 28.723(1)(e), as added by 2011 PA 17. Further, sex offenders were classified into three "tiers" according to the offense they were convicted of. MCL 28.722(r)-(w), as added by 2011 PA 17. Tier I offenders were required to register for 15 years, Tier II offender for 25 years, and Tier III offenders for life. MCL 28.725(10)-(12), as added by 2011 PA 17. Offenders were also now required to report in person when they change residences, change places of employment, discontinue employment, enroll as a student with institutions of higher education, discontinue such enrollment, change their names, temporarily reside at any place other than their residence for more than seven days, establish an e-mail or instant message address or "any other designations used in internet communications or postings," purchase or "begin[] to regularly operate" a vehicle, or discontinue such ownership or operation. MCL 28.725(1)(a)-(h), as added by 2011 PA 17.

In 2013, SORA was amended to require a $50 registration fee upon initial registration and each year thereafter, capped at $550. MCL 28.725a(6), as amended by 2013 PA 149. Further, the number of times and months an offender had to report became dependent on the tier he fell into. MCL 28.725a(3), as amended by 2013 PA 149. In the present case, defendant, as a Tier III offender, must report for the rest of his life four times each year, MCL 28.725a(3)(c), as well as upon the occurrence of any events listed in MCL 28.725(1).

## B.  THE *MENDOZA-MARTINEZ* FACTORS

Determining whether a statutory scheme imposes punishments requires a two-step inquiry. *Temelkoski*, 307 Mich App at 258. First, the Court must determine whether the Legislature intended the statute to be punitive. *Id*. If the intent was to punish, the inquiry is complete. *Id*. But "if the Legislature intended to enact a civil remedy, the court must also ascertain whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id*. (citations and quotation marks omitted; alteration in *Temelkoski*). To do so, the Court looks to the seven factors enunciated in *Kennedy v Mendoza-Martinez*, 372 US 144; 83 S Ct 554; 9 L Ed 2d 644 (1963). *Temelkoski*, 307 Mich App at 259. Those factors are as follows:

> "[1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned." [*People v*

*Earl*, 495 Mich 33, 44; 845 NW2d 721 (2014), quoting *Mendoza-Martinez*, 372
US at 168-169 (alterations in *Earl*).]

These seven factors serve as "useful guideposts" and are "neither exhaustive nor dispositive."
*Earl*, 495 Mich at 44   Further, a party asserting that a statutory scheme imposes punishment
must provide " 'the clearest proof' " that the scheme " 'is so punitive either in purpose or effect
to negate the . . . intention to deem it civil.' " *Id*., quoting *Kansas v Hendricks*, 521 US 346, 361;
117 S Ct 2072; 138 L Ed 2d 501 (1997) (alteration in *Earl*).

In this case, defendant does not dispute that the Legislature did not intend SORA to
constitute punishment.  Indeed, the Legislature explicitly stated that its intent was not to impose
punishment.  MCL 28.721a.  Based largely on this statement of purpose, this Court has
"conclude[d] that the Legislature intended SORA as a civil remedy to protect the health and
welfare of the public." *Temelkoski*, 307 Mich App at 262.  Therefore, it is necessary to look to
the *Mendoza-Martinez* factors to determine whether the school safety zones and in-person
reporting requirements are so punitive in purpose or effect that they negate the Legislature's
intent to deem them civil.  See *id*. at 262.  In this endeavor, we first find instructive the United
States Supreme Court's application of the *Mendoza-Martinez* factors to the Alaska sex offender
registration statute in *Smith v Doe*, 538 US 84; 123 S Ct 1140; 155 L Ed 2d 164 (2003).

## C.  *SMITH*

*Smith* "is the preeminent case holding that a sex offender registration and notification
law, as applied to an adult defendant, is not a form of punishment." *Temelkoski*, 307 Mich App
at 263.  The Supreme Court applied the *Mendoza-Martinez* factors and determined that the
Alaska sex offender registration statute, Alaska Stat § 12.63.010 *et seq*., did not constitute
punishment for ex post facto purposes. *Smith*, 538 US at 97-106.

### 1.  AFFIRMATIVE DISABILITY OR RESTRAINT

The *Smith* Court first observed that sex offender registration does not resemble
imprisonment, "the paradigmatic affirmative disability or restraint." *Smith*, 538 US at 100.  The
Court noted that the Alaska statute did "not restrain activities sex offenders may pursue but
leaves them free to change jobs or residences." *Id*.  The Court also reasoned that although
registration may negatively affect offenders, such as in finding housing and employment, "these
consequences flow not from the Act's registration and dissemination provisions, but from the
fact of conviction, already a matter of public record." *Id*. at 101.  Finally, the Court noted that
offenders were not required to register in person. *Id*.

The Court also rejected the contention that registration is akin to probation or supervised
release, although it acknowledged that the argument "has some force." *Id*. at 101.  The Court
explained that "[p]robation and supervised release entail a series of mandatory conditions and
allow the supervising officer to seek the revocation of probation or release in case of infraction."
*Id*.  Sex offenders, on the other hand, were "free to move where they wish and to live and work
as other citizens, with no supervision." *Id*.  And although registrants were required to "inform
the authorities after they change their facial features (such as growing a beard), borrow a car, or
seek psychiatric treatment, they [were] not required to seek permission to do so." *Id*.  Further,

although offenders faced criminal penalties for failing to comply with reporting requirements, such penalties arose from proceedings that were separate from their underlying offense. *Id*. at 101-102.

## 2. HISTORICAL PUNISHMENTS

The Court found any resemblance between sex offender registration and historical shaming punishments "misleading." *Smith*, 538 US at 97-98. "Punishments such as whipping, pillory, and branding," the Court explained, "inflicted physical pain and staged a direct confrontation between the offender and the public." *Id*. at 98. Conversely, the stigma attached to a registered sex offender "results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." *Id*. The Court reasoned, "Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." *Id*. The Court also stated that adverse effects felt by registrants, such as "mild personal embarrassment" and "social ostracism" were not "an integral part of the objective of the regulatory scheme." *Id*. at 99.

The Court added that "[t]he fact that Alaska posts the information on the Internet d[id] not alter [its] conclusion." *Smith*, 538 US at 99. "The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender," the Court explained. *Id*. "Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." *Id*. "The process is more analogous," the Court stated, "to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality." *Id*. The Court also observed that the registry was passive, as a member of the public must seek out the information on the website. *Id*. The Court further noted that Alaska's website did not allow the public to shame an offender by, for example, "posting comments underneath his record." *Id*.

## 3. SCIENTER

The *Smith* Court found this factor to be "of little weight" without extended explanation. *Smith*, 538 US at 105.

## 4. TRADITIONAL AIMS OF PUNISHMENT: DETERRENCE AND RETRIBUTION

The Court stated that it was undisputed that the sex offender registry could potentially deter crime. *Smith*, 538 US at 102. But the Court noted that "[a]ny number of governmental programs might deter crime without imposing punishment." *Id*. The Court reasoned, " 'To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.' " *Id*., quoting *Hudson v United States*, 522 US 93, 105; 118 S Ct 488; 139 L Ed 2d 450 (1997).

The Court also disagreed with the proposition that registration was retributive because the length of time that an offender was required to register "appear[ed] to be measured by the extent of the wrongdoing, not by the extent of the risk posed." *Smith*, 538 US at 102 (quotation marks and citation omitted). Although the Court acknowledged that the statute "differentiate[d]

between individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense," it found that such "broad categories" and the "corresponding length of the reporting requirement" were "reasonably related to the danger of recidivism," which was "consistent with the regulatory objective." *Id*.

### 5. CRIMINAL BEHAVIOR

Along with the scienter factor, the Court found this factor to be "of little weight." *Smith*, 538 US at 105. "The regulatory scheme applies only to past conduct, which was, and is, a crime," the Court explained. *Id*. The Court stated that this was "a necessary beginning point, for recidivism is the statutory concern." *Id*. The Court added that "[t]he obligations the statute impose[d] are the responsibility of registration, a duty not predicated upon some present or repeated violation." *Id*.

### 6. RATIONAL CONNECTION TO A NONPUNITIVE PURPOSE

The Court held that this was the most significant factor in its determination. *Smith*, 538 US at 102. The Court stated that the Alaska sex offender registration statute had "a legitimate nonpunitive purpose of public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y]." *Id*. at 102-103 (quotation marks and citation omitted; alteration in *Smith*). According to the Court, the respondents acknowledged that this purpose was valid and rational. *Id*. at 103. They argued, however, that the statute "lack[ed] the necessary regulatory connection because it [was] not narrowly drawn to accomplish the stated purpose." *Id*. (quotation marks and citation omitted). The Court rejected that argument and stated, "A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id*.

### 7. EXCESSIVENESS

The *Smith* Court rejected the contention that the statute was excessive because it applied to all convicted sex offenders without individual determinations of dangerousness. *Smith*, 538 US at 103. "Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism," the Court reasoned. *Id*. The Court found this to be "consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Id*. The Court noted that "[t]he risk of recidivism posed by sex offenders is 'frightening and high.' " *Id*., quoting *McKune v Lile*, 536 US 24, 34; 122 S Ct 2017; 153 L Ed 2d 47 (2002). The Court stated, "The *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Smith*, 538 US at 103. The Court further explained that a legislature has the power to fashion "a rule of universal application." *Id*. at 104 (quotation marks and citation omitted). "The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause." *Id*. The Court stated that Alaska was permitted to "dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions without" thereby imposing punishment. *Id*.

-10-

The Court also rejected the argument that the duration of the reporting requirements was excessive. *Id*. at 104. The Court relied on empirical research, which showed that most child molesters who reoffend do so not within the first several years after they were released but " 'as late as 20 years following release.' " *Id*. (citation omitted).

The Court likewise rejected the contention that the registry was excessive because of its wide dissemination. *Smith*, 538 US at 104. The Court reiterated that the registry was passive because "[a]n individual must seek access to the information." *Id*. at 105. The Alaska website also warned "that the use of displayed information to commit a criminal act against another person is subject to criminal prosecution." *Id*. (quotation marks and citation omitted). "Given the general mobility of our population," the Court reasoned, "for Alaska to make its registry system available and easily accessible throughout the State was not so excessive a regulatory requirement as to become a punishment." *Id*. The Court stated that determining excessiveness "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy," but "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id*. The Court concluded that the Alaska statute met that standard. *Id*.

## D. APPLICATION OF THE *MENDOZA-MARTINEZ FACTORS* TO SCHOOL SAFETY ZONES AND IN-PERSON REPORTING REQUIREMENTS

This Court in *Temelkoski* generally endorsed the analysis in *Smith*. *Temelkoski*, 307 Mich App at 262-270. As noted, however, the Michigan SORA has changed substantially since it was first enacted in 1994. Further, given recent amendments, it is also markedly different from the statute reviewed by the United States Supreme Court in *Smith* in 2003. Although defendant argues that SORA as a whole is unconstitutional, he primarily takes issue with the school safety zones and in-person reporting requirements. *Temelkoski* did not address these particular provisions, although it generally held that sex offender registration does not impose punishment. *Id*. Under these circumstances, we conclude that the sex offender registration does not impose punishment and focus on whether the school safety zones and in-person reporting requirements are punitive in purpose or effect using the *Mendoza-Martinez* factors.[10]

### 1. AFFIRMATIVE DISABILITY OF RESTRAINT

#### a. SCHOOL SAFETY ZONES

---

[10] The prosecution relies heavily on *Doe v Snyder*, 932 F Supp 2d 803, 811-814 (ED Mich, 2013), in which the court purportedly held that the recent amendments to SORA did not make the scheme punitive in effect. The court stated that the new provisions had "repeatedly been upheld." *Id*. at 811. However, the court relied on cases from 1999 and 2000 for that proposition, and the school safety zone and in-person reporting provisions were added after those cases were decided. See *id*. Therefore, we find that decision unpersuasive.

Some state courts have concluded that school safety zones impose an affirmative disability or restraint on sex offenders.[11] The Supreme Court of Indiana, addressing a similar provision barring sex offenders from residing within 1,000 feet of school property, held that such a restriction "is neither minor nor indirect." *State v Pollard*, 908 NE2d 1145, 1147, 1150 (Ind, 2009). The Indiana law, however, did not include a grandfather provision, and thus barred registrants from living within 1,000 feet of a school even if the registrant had lived there before the law was passed. *Id*. at 1150. The law also required a registrant to change residences if a school or youth program center opened within 1,000 feet of the registrant's residence. *Id*.

The Supreme Court of Kentucky, addressing a provision disallowing sex offenders from living within 1,000 feet of a school, stated that it found it "difficult to imagine that being prohibited from residing within certain areas does not qualify as an affirmative disability or restraint." *Commonwealth v Baker*, 295 SW3d 437, 439-441, 445 (Ky, 2009). Similar to the Indiana law, a registrant in Kentucky "face[d] a constant threat of eviction" because he or she would be forced to move if a school opened upon within 1,000 feet of his or her home. *Id*.

But other courts have held to the contrary. The Supreme Court of Iowa, addressing a statute prohibiting sex offenders from living within 2,000 feet of a school, recognized that such a provision "clearly impose[s] a form of disability." *State v Seering*, 701 NW2d 655, 659, 668 (Iowa, 2005). But the court held that "the disabling nature of the statute is not absolute." *Id*. The court added, "[W]e are mindful of the objectives of the residency restriction under the statute and understand that a statute that imposes some degree of disability does not necessarily mean the state is imposing punishment." *Id*.

We agree with the reasoning of the Indiana and Kentucky courts. Prohibiting registrants from living and working in many areas is undoubtedly an affirmative restraint. Further, the grandfather clause in Michigan is limited, as it only applies to residences where the offenders were living before January 1, 2006. MCL 28.735(3)(c). If that clause does not apply and a person who lives in a school safety zone commits a sex offense and is required to register, he or she will be forced to leave his or her home. MCL 28.735(4). Therefore, rather than merely restraining sex offenders, the school safety zone may expel offenders in certain circumstances. Also, offenders who are not protected by the grandfather clause face the constant prospect that they will be forced to move if a new school opens near their home. Unlike in *Smith*, offenders under the current Michigan SORA are not entirely free to change residences or jobs given the student safety zone provisions. Although we agree with the *Seering* Court that such a restraint is not "absolute," it is a restraint nonetheless. See *Seering*, 701 NW2d at 659.

---

[11] Cases from foreign jurisdictions are not binding on this Court, but may be persuasive. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010). Similarly, lower federal court decisions are not binding on this Court, but may be persuasive. *People v Fomby*, 300 Mich App 46, 50 n 1; 831 NW2d 887 (2013).

## b. IN-PERSON REPORTING REQUIREMENTS

Some state courts have also concluded that frequent in-person reporting requirements impose an affirmative disability or restraint. The Supreme Judicial Court of Maine held that a similar provision requiring quarterly, in-person reporting "place[d] substantial restrictions on the movements of lifetime registrants and may work an impractical impediment that amounts to an affirmative disability." *State v Letalien*, 2009 ME 130, ¶ 37; 985 A2d 4 (2009) (quotation marks and citation omitted). Distinguishing the reporting requirement at issue in *Smith*, the court stated that the requirement of quarterly, in-person reporting for life "is undoubtedly a form of significant supervision by the state." *Id*. "[I]t belies common sense," the court concluded, "to suggest that a newly imposed lifetime obligation to report to a police station every ninety days to verify one's identification, residence, and school, and to submit to fingerprinting[12] and provide a current photograph,[13] is not a substantial disability or restraint on the free exercise of individual liberty." *Id*. at ¶ 56. The Supreme Court of New Hampshire recently endorsed the *Letalien* Court's reasoning. *Doe v State*, 167 NH 382, 405; 111 A3d 1077 (2015).

The Supreme Court of Oklahoma adopted the same reasoning regarding its similar in-person reporting requirements. *Starkey v Oklahoma Dep't of Corrections*, 2013 OK 43, ¶ 49; 305 P3d 1004 (2013). Like defendant in the case at hand, the defendant in *Starkey* would have been required, under threat of prosecution, "to make an 'in person' appearance every 90 days for life and every time he moves, changes employment, changes student status, or resides somewhere for 7 consecutive days or longer." *Id*. See also MCL 28.725a(3)(c); MCL 28.725(1). The Supreme Court of Oklahoma deemed these requirements "significant and intrusive." *Starkey*, 2013 OK at ¶ 49.

But other courts have disagreed. United States Court of Appeals for the First Circuit in *United States v Parks*, 698 F3d 1, 5-6 (CA 1, 2012), held that although periodic in-person reporting is inconvenient, such "inconvenience is surely minor compared to the disadvantages of the underlying scheme in its consequences for renting housing, obtaining work and the like—consequences that were part of the package that *Smith* itself upheld." The United States Court of Appeals for the Eleventh Circuit in *United States v WBH*, 664 F3d 848, 857 (CA 11, 2011), likewise held that quarterly in-person reporting "may be more inconvenient, but requiring it is not punitive."

We agree with the reasoning of the Maine and Oklahoma courts. The reporting requirements in Michigan are onerous. Reporting requirements vary by "tier," and Tier III offenders such as defendant are required to report in person four times a year for life. MCL

---

[12] The Michigan SORA requires fingerprinting only once. MCL 28.727(1)(q).

[13] Under the Michigan SORA, registrants must have a new photograph taken if "[t]he officer or authorized employee" determines that the registrant's preexisting photograph does not "match[] the appearance of the individual sufficiently to properly identify him or her from that photograph." MCL 28.725a(5).

28.725a(3). In addition, MCL 28.725(1) provides, in part, that all registrants must report in person after any of the following events occur:

(a) The individual changes or vacates his or her residence or domicile.

(b) The individual changes his or her place of employment, or employment is discontinued.

(c) The individual enrolls as a student with an institution of higher education, or enrollment is discontinued.

(d) The individual changes his or her name.

(e) The individual intends to temporarily reside at any place other than his or her residence for more than 7 days.

(f) The individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings.

(g) The individual purchases or begins to regularly operate any vehicle, and when ownership or operation of the vehicle is discontinued.

The United States Supreme Court in *Smith* noted that the scheme in that case did not impose a disability or restraint because offenders were not required to report in person. *Smith*, 538 US at 101. In contrast, under the current Michigan SORA, offenders are required to report in person up to four times a year and after any of the events listed in MCL 28.725a occurs. Many of the events listed in MCL 28.725a(3) may occur frequently in the life of an average person. Thus, the in-person reporting requirements strike us as more than a mere inconvenience. Rather, we conclude that they amount to an affirmative disability or restraint. See *id*.

## 2. HISTORICAL PUNISHMENTS

### a. SCHOOL SAFETY ZONES

Some courts have concluded that school safety zones are analogous to historical punishments. The *Pollard* Court stated that "restrictions on living in certain areas is not an uncommon condition of probation or parole." *Pollard*, 908 NE2d at 1151. Courts have also compared the restrictions to banishment. "Banishment" is defined as " 'a punishment inflicted upon criminals, by compelling them to quit a city, place, or country, for a specific period of time, or for life.' " *United States v Ju Toy*, 198 US 253, 269-270; 25 S Ct 644; 49 L Ed 1040 (1905) (citation omitted). The *Baker* Court found that the restrictions that prevented offenders from living in certain areas and that expelled offenders from their homes were "decidedly similar to banishment." *Baker*, 295 SW3d at 444. The *Starkey* Court concurred with that reasoning. *Starkey*, 2013 OK at ¶ 60.

But other courts have denied that registration is similar to banishment. The Supreme Court of Iowa stated that although the defendant "may have a sense of being banished to another area of the city, county, or state," registration did not amount to "true banishment," which "goes

-14-

beyond the mere restriction of 'one's freedom to go or remain where others have the right to be: it often works a destruction on one's social, cultural, and political existence.' " *Seering*, 701 NW2d at 667, quoting *Poodry v Tonawanda Band of Seneca Indians*, 85 F3d 874, 897 (CA 2, 1996). The court added that "[o]ffenders are not banished from communities and are free to engage in most community activities." *Id.* at 667.

We agree with the reasoning in *Pollard* and *Baker* that the restrictions created by the school safety zone provisions resemble banishment. Unlike in *Smith*, registrants are affirmatively barred from living in certain areas. Also, unless offenders are protected by the limited grandfather provision, they can be expelled from their residences as a consequence of registration. Although admittedly not true banishment, we find the similarity undeniable. Further, restrictions on where an offender can live or work are common conditions of probation or supervised release. *Smith*, 538 US at 101. Therefore, we believe that the restrictions imposed by the school safety zones have historically been regarded as a punishment.

### b. IN-PERSON REPORTING REQUIREMENTS

Cases addressing in-person reporting requirements have focused on the similarity to probation and parole. The Supreme Court of Indiana concluded that in-person reporting was "comparable to conditions of supervised probation or parole." *Wallace v State*, 905 NE2d 371, 376, 380 (Ind, 2009). However, the Wyoming Supreme Court disagreed that in-person reporting requirements were similar to probation or parole, relying on *Smith*. *Kammerer v State*, 2014 WY 50, ¶ 22; 322 P3d 827 (Wy, 2014). The court denied that registration was similar to "monitoring . . . imposed under supervised probation or parole." *Id*.

Many of the considerations noted by *Smith* still apply to the current Michigan SORA. Sex offenders are not required to seek permission to do many things, such as change residences or cars, but are only required to report such changes. Also, penalties for failing to comply with SORA arise from proceedings separate from the offender's underlying offense. But the scheme examined in *Smith* did not entail in-person reporting. As stated, defendant, as a Tier III offender, must report in person four times each year for the rest of his life, MCL 28.725a(3)(c), as well as upon the occurrence of any events listed in MCL 28.725(1). This is far more intrusive than the reporting requirements in *Smith* and imposes a great amount of supervision by the state. We agree with the *Wallace* Court that such demanding in-person reporting requirements are at least "comparable to conditions of supervised probation or parole." See *Wallace*, 905 NE2d at 380.

## 3. SCIENTER

This Court has declined to consider this factor in assessing whether sex offender registration constitutes punishment. *Temelkoski*, 307 Mich App at 262.[14] We therefore decline to address the factor. See *id*.

## 4. TRADITIONAL AIMS OF PUNISHMENT: DETERRENCE AND RETRIBUTION

### a. SCHOOL SAFETY ZONES

Some courts have concluded that school safety zones promote deterrence and retribution to such a degree that they are punitive. The court in *Pollard* stated that such restrictions are "apparently designed to reduce the likelihood of future crimes by depriving the offender of the opportunity to commit those crimes." *Pollard*, 908 NE2d at 1152. The court determined that the provision was "an even more direct deterrent to sex offenders than the . . . registration and notification regime." *Id*. The court in *Baker* found that such restrictions are retributive given that there was "no individualized determination of the dangerousness of a particular registrant." *Baker*, 295 SW3d at 444. The court noted that "[e]ven those registrants whose victims were adults are prohibited from living near an area where children gather." *Id*. "When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety," the court concluded, "that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones." *Id*. The court in *Starkey* essentially adopted the same reasoning. *Starkey*, 2013 OK at ¶ 66. Courts concluding to the contrary have relied on the statement from *Smith* that government programs can deter crime without imposing punishment. See, e.g., *Seering*, 701 NW2d at 668; *Kammerer*, 2014 WY at ¶¶ 26.

The primary reason for the creation of the school safety zones is the desire to specifically deter future sexual offenses by registrants. As in *Pollard*, it appears that the provisions were "designed to reduce the likelihood of future crimes by depriving the offender of the opportunity to commit those crimes." *Pollard*, 908 NE2d at 1152. Nonetheless, the disclaimer from *Smith* still applies: "[a]ny number of governmental programs might deter crime without imposing punishment." *Smith*, 538 US at 102. But the school safety zone provisions are unlike the statute at issue in *Smith*. In that case, the Alaska statute was a passive notification scheme designed to allow members of the public to protect themselves from sex offenders. In this case, the school safety zone provisions are not passive. Rather, registrants are specifically prohibited them from living, working, and loitering in many areas. We agree with the observation of the *Pollard* Court that school safety zones are "an even more direct deterrent to sex offenders than the . . . registration and notification regime." *Pollard*, 908 NE2d at 1152. In sum, we find that the foremost purpose of the school safety zones is deterrence.

---

[14] We note that other courts have concluded that because most sex offenses require a finding of scienter, this factor counsels in favor of deeming registration punishment. See, e.g., *Doe v State*, 189 P3d 999, 1012-1013 (Alas, 2008).

However, we disagree that the school safety zones are necessarily retributive. Although the observations of the *Baker* Court have some merit, we are mindful of the admonition that the Legislature is permitted to legislate with regard to sex offenders as a class without individual determinations of future dangerousness. See *Smith*, 538 US at 103. It is the province of the Legislature to determine that all sex offenders, regardless of their offenses, should be segregated from children. While one can reasonably question the usefulness of such a broadly sweeping measure, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id*. Therefore, we cannot say that the school safety zones have the purpose or effect of promoting retribution. See *id*.

### b. IN-PERSON REPORTING REQUIREMENTS

Cases have not extensively addressed whether in-person reporting requirements promote deterrence and retribution. The requirements are designed to ensure that the information provided on the registry is accurate and up-to-date. Accurate and up-to-date information is essential to "monitoring those persons" who the "legislature has determined . . . pose[] a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." MCL 28.721a. Therefore, we cannot conclude that such measures necessarily promote deterrence or retribution. Still, we acknowledge that more rigorous reporting requirements could promote deterrence and retribution. If, for example, offenders were required to report in person twice daily, such onerous requirements could begin to appear less useful to promoting the regulatory goals of SORA and more like deterrence and retribution. However, the reporting requirements are not so extreme. Tier III offenders, those subjected to the most reporting requirements, are only required to report four times each year, as well as upon the occurrence of any events listed in MCL 28.725(1). See MCL 28.725a(3)(c). Although certainly burdensome for the offenders, we cannot say that these requirements promote deterrence or retribution to such an extent that they are punitive. See *id*.

### 5. CRIMINAL BEHAVIOR

Like the United States Supreme Court, this Court has declined to consider this factor in assessing whether sex offender registration constitutes punishment. *Temelkoski*, 307 Mich App at 262.[15] Therefore, we decline to address this factor. See *id*.

### 6. RATIONAL CONNECTION TO A NONPUNITIVE PURPOSE

As defendant admits, nearly every court has held that sex offender registration laws serve a nonpunitive purpose of public safety. However, defendant questions whether the connection is rational. He calls attention to law review articles that advance the proposition that registration

---

[15] We note that the Alaska Supreme Court in *Doe* concluded that because registration laws only apply to convicted sex offenders and not "other individuals who may pose a threat to society even if they were not convicted," the effect was punitive. *Doe*, 189 P3d at 1014-1015. For example, registration laws do not apply to "defendants whose convictions are overturned for reasons other than insufficiency of evidence of guilt." *Id*. at 1015.

laws do not reduce recidivism and that sex offenders, as a class, are not prone to recidivism. While perhaps true that in certain circumstances the school safety zones and in-person reporting requirements do more harm than good, we cannot conclude that they are irrational measures for accomplishing the stated regulatory purpose of SORA. Further, we are not charged with determining the wisdom of these measures. Such questions are for the Legislature to decide. *People v Wallace*, 284 Mich App 467, 470; 772 NW2d 820 (2009) (noting that the wisdom of a policy is a political question). Similarly, it is the Legislature that is charged with the authority to revisit, if it so chooses, the efficacy of the legislation. See *id*.

To the extent that defendant and amicus argue that the recapture provision is not rational as applied to defendant given that defendant's last sex offense conviction was 25 years ago, we must disagree. The argument has some merit, but we cannot conclude that requiring defendant to register as a sex offender is wholly irrational. Although defendant's sex offense conviction was 25 years ago, he committed another felony in 2013, and has "shown a general tendency to recidivate." See *People v Fredericks*, 2014 Ill App 122122, ¶ 60; 383 Ill Dec 293; 14 NE3d 576 (2014).

## 7. EXCESSIVENESS

### a. SCHOOL SAFETY ZONES

Some courts have held that the broad application of student safety zones is excessive. The Supreme Court of Indiana in *Pollard* stated, "Restricting the residence of offenders based on conduct that may have nothing to do with crimes against children, and without considering whether a particular offender is a danger to the general public, the statute exceeds its non-punitive purposes." *Pollard*, 908 NE2d at 1153. The Supreme Court of Kentucky likewise concluded that given the magnitude of the restraint imposed by residency restrictions, the lack of individual determinations of the future dangerousness of registrants rendered the restrictions excessive. *Baker*, 295 SW3d at 446. Other courts have concluded to the contrary. The Supreme Court of Iowa in *Seering* concluded that given "the special needs of children" and "the imprecise nature of protecting children from the risk that convicted sex offenders might reoffend," residency restrictions are not excessive. *Seering*, 701 NW2d at 668.

We find that the Supreme Court's observations from *Smith* still apply. The Legislature is "not preclude[d] . . . from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Smith*, 538 US at 103. The Court explained that the legislature had the power to fashion "a rule of universal application." *Id*. at 104 (quotation marks and citation omitted). Further, "[t]he State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause." *Id*.

One can reasonably question the usefulness of prohibiting certain offenders from living and working within the zones even though their offenses were not committed against children. Despite these reservations, as we have already noted, the wisdom of a statute is a question for the Legislature. *Wallace*, 284 Mich App at 470. Moreover, the Legislature was not precluded from

making categorical judgments of this nature. *Smith*, 538 US at 103. Therefore, the school safety zones prohibition is not excessive.

### b.  IN-PERSON REPORTING REQUIREMENTS

Courts have not extensively addressed whether in-person reporting requirements are excessive. The Supreme Court of New Hampshire found the lifetime duration of registration to be excessive. *Doe*, 167 NH at 410. "If in fact there is no meaningful risk to the public, then the imposition of such requirements becomes wholly punitive." *Id*. We disagree. Again, the Legislature is tasked with determining the risk posed by sex offenders. Moreover, although the in-person reporting requirements of the Michigan SORA are onerous, it is difficult to conclude that they are necessarily excessive. Rather, as stated, they are reasonably designed to ensure that the information on the registry is accurate and up-to-date. Therefore, the in-person reporting requirements are not excessive.

### E.  CONCLUSION

### 1.  SCHOOL SAFETY ZONES

As is apparent from our foregoing discussion, the *Mendoza-Martinez* factors point us in both directions when it comes to school safety zones. We conclude that such zones impose affirmative restraints, resemble historical punishments, and promote deterrence. However, we also conclude that they are rationally connected to the nonpunitive purpose of public safety and that they are not excessive, as the Legislature is permitted to make the categorical judgment that sex offenders should not live, work, or loiter near schools. Weighing these factors, we are mindful that the burden lies with defendant to establish that school safety zones are punitive. As stated, a party asserting that a statutory scheme imposes punishment must provide "the clearest proof" that the scheme " 'is so punitive either in purpose or effect to negate the . . . intention to deem it civil.' " *Earl*, 495 Mich at 44, quoting *Hendricks*, 521 US at 361 (alteration in *Earl*). In this case, given that the *Mendoza-Martinez* factors cut both ways, we cannot conclude that defendant has met his burden. Further, even some of the factors that weigh in defendant's favor only do so to a limited extent. The zones plainly restrict where offenders can live and work, but the restriction is not absolute, and, therefore, the restrictions are distinguishable from true banishment. And although the zones specifically deter the registered offenders, the *Smith* Court held that even a deterrent purpose will not render a civil regulatory scheme punitive. *Smith*, 538 US at 102. Moreover, the nonpunitive purpose of the zones is the most important factor in determining whether they are punitive in effect. See *id*. Given these considerations, there is not the clearest proof that the school safety zones are so punitive in purpose or effect as to negate the Legislature's intent to deem them civil. See *id*.

### 2.  IN-PERSON REPORTING REQUIREMENTS

Regarding the in-person reporting requirements, the *Mendoza-Martinez* factors do not readily lead to one conclusion over the other. The requirements impose affirmative restraints and arguably resemble conditions of probation and supervised release. However, they do not necessarily promote deterrence or retribution, they are rationally connected to the nonpunitive purpose of protecting the public by ensuring that the registry is accurate, and they are not

excessive. As with the school safety zones, we cannot find the clearest proof that they are punitive in effect given that the *Mendoz-Martinez* factors cut both ways. Further, we again find that even some of the factors that weigh in defendant's favor only do so to a limited extent. Although the reporting requirements are undeniably burdensome, their restraining effect is not absolute. Registrants are not precluded from many activities, such as changing residences or jobs, but are merely required to report them. And many of the considerations that *Smith* used to distinguish sex offender registration from probation and supervised release still apply to the in-person reporting requirements. Moreover, the nonpunitive purpose of the zones is the most important factor in determining whether they are punitive in effect. See *Smith*, 538 US at 102. Given these considerations, we conclude that there is not the clearest proof that the in-person reporting requirements are so punitive in purpose or effect as to negate the Legislature's intent to deem them civil.

## IV. CONCLUSION

We conclude that the recapture provision in MCL 28.723(1)(e) is constitutional. First, the recapture provision found in MCL 28.723(1)(e) did not change the legal consequences of defendant's 1990 conviction. Rather, it attached legal consequences to his 2013 convictions. Therefore, that provision does not violate the Ex Post Facto Clauses of the state and federal Constitutions. Second, the school safety zones and in-person reporting requirements of SORA do not constitute punishment. Therefore, they necessarily cannot constitute cruel or unusual punishment.

Affirmed.

/s/ Joel P. Hoekstra
/s/ Kathleen Jansen
/s/ Patrick M. Meter

-20-