# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

RADU VASILE MUNTEAN,

      Defendant-Appellant.

UNPUBLISHED
October 30, 2018

No. 334952
Wayne Circuit Court
LC No. 16-003290-01-FC

Before: BECKERING, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

Defendant, Radu Vasile Muntean, appeals as of right his jury convictions of assault with intent to do great bodily harm less than murder, MCL 750.84, unlawful imprisonment, MCL 750.349b, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1), aggravated domestic violence, MCL 750.81a(2), and torture, MCL 750.85. Defendant was also charged with, but acquitted of, assault with intent to commit murder, MCL 750.83, and felonious assault, MCL 750.82. The trial court sentenced defendant to concurrent prison terms of 80 months to 10 years for the assault conviction, 10 to 15 years for the unlawful imprisonment conviction, one year for the aggravated domestic violence conviction, and 225 to 450 months for the torture conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. FACTUAL BACKGROUND

Defendant's convictions arise from a brutal domestic violence incident in March 2016 between defendant and his wife, with whom defendant has a young daughter. Although nearly 20 witnesses testified at the six-day trial, including numerous evidence technicians, forensic experts, and first responders, there are no factual disputes concerning forensic evidence or the fundamental nature of the life-threatening injuries the victim suffered. Rather, this case ultimately boiled down to questions of intent and witness credibility. Specifically, defendant and the victim provided varying accounts of how—and more importantly *why*—the victim sustained her injuries.

-1-

The prosecution's theory of the case was that defendant intended to kill the victim for her perceived infidelity and to gain sole custody of their daughter, so he waited until she was scheduled to leave home for a month-long trip, picked her up, and instead of driving her to her intended destination, he shot her in both calves, drove her to a vacant lot in a secluded area of Detroit, handcuffed and held her in the vacant lot for 17 hours during which time he partially undressed her, beat her severely with his fists and a handgun, broke her jaw, stabbed her, cut her, strangled her, and only failed to torture her to death because an undercover police officer happened to interrupt the crime before the victim died of blood loss or hypothermia. The defense theory was that defendant admittedly *did* commit aggravated domestic violence against the victim by punching her in the face several times and breaking her jaw, but the jury should discredit the victim's testimony as unbelievable because defendant did not intend to kill the victim, cause her great bodily harm, or torture her, and he never "secretly confined" her for purposes of unlawful imprisonment; rather, while suicidal and intoxicated, defendant lost his temper, struck the victim, and accidentally shot her when she tried to grab his gun away from his head, but he later came to his senses and tried to seek aid for her.

According to the victim, defendant picked her up on the evening in question at around 6:20 p.m., as planned, to visit their daughter, who was staying with an overnight childcare provider. As they drove in defendant's pickup truck, the couple began to argue, and defendant began "shoving and hitting" the victim. The victim had two cellphones with her—one personal and one for work—and when she attempted to use her work phone, defendant grabbed it and threw it out the window of the moving truck. After stopping at a traffic signal, defendant turned and punched the victim in the face several times. He then continued to drive, merging onto the freeway. The couple continued to argue, and defendant produced a semiautomatic handgun that he frequently carried. After briefly "wiggling" the gun around, defendant aimed it at the victim's leg, and she pushed it away. Defendant again deliberately aimed the gun at her leg, and this time fired. The bullet went through the victim's left calf and entered her right calf, where it became lodged.

The victim asked defendant to take her to the hospital. Instead, he drove to "an empty field" in a "very desolate" area of Detroit, where he held the victim overnight. At times, defendant admittedly handcuffed the victim to her seatbelt. Defendant spoke of committing suicide and told the victim that he was "not going to go" before she did. The victim interpreted this as a threat that defendant was going to kill her, and she wondered how he would do it. She assumed that he would shoot her, but she wondered whether he would shoot her in the chest or the head, further wondering how much it might hurt.

At some point, the couple began to argue again. Defendant lunged at the victim with a pocketknife, and she opened her door and slid out, falling to the ground. As she struggled to pull herself away from the truck, defendant pursued her. He tried to stab her, and she used her hands defensively, sustaining a stab wound in one hand. After stabbing the victim several times in the legs, defendant began "beating [the victim] over the head with the gun." As she continued to struggle, defendant sat on her chest, using his knees to pin her arms to the ground, and he began to strangle her. She was on top of a tree root, and the pressure of defendant's weight caused pain "everywhere." At one point, defendant "turned" the victim's head, and she "felt [her] jaw shift over unnaturally." She later discovered that her jaw was broken, with one bone "completely" fractured. Defendant accused the victim of being unfaithful, and she tried to appease him,

-2-

denying the accusations. But defendant "just got angrier and started choking [her] even more." Somehow, her shirt ripped open, exposing her breasts, and defendant cut them with the pocketknife. "[H]e took the knife and ran it from [her] chest down to [her] nipples . . . making a scar."

Eventually, defendant was distracted by some unknown occurrence. He stood and peered over the pickup truck at something the victim could not see, and then stooped to pick her up. As he did so, she lost consciousness. When she next woke, it was daylight, and she saw that defendant was in front of the truck, in handcuffs.

While working in the area, Dan Kolar, an undercover Grosse Pointe police officer, noticed defendant's pickup truck and investigated. As Officer Kolar approached in his unmarked police vehicle, defendant exited the pickup truck and approached, waving as if to get Kolar's attention. Defendant displayed a gold badge and indicated that he was a police officer. After displaying his own badge, Officer Kolar identified himself as a police officer. Defendant then indicated that he was there to pick up his girlfriend, "who was beat up." Defendant's hands and clothing were stained red, and Officer Kolar felt that "[s]omething was not right." For officer safety, he placed defendant in handcuffs, then asked where his girlfriend was, and defendant responded by motioning toward the pickup truck. When Officer Kolar asked another question, defendant "stated that he did not have to answer anymore . . . questions because he was in handcuffs." Officer Kolar approached the pickup truck and discovered the victim, badly beaten, covered in blood and lacerations, naked from the waist down, and partially covered with a blanket. The interior of the truck was bloody. Officer Kolar asked the victim if she was okay, and she gave an incoherent response. She was "[v]ery lethargic." She stared straight ahead, not looking at Officer Kolar. Officer Kolar radioed for backup and paramedics. After backup arrived, Officer Kolar noticed that he "could distinctively see a blood trail that went from like the passenger side door to the back of the pick up truck." The blood trial proceeded "maybe another 20 feet" from the back of the pickup truck to the place where Kolar found the victim's "[b]lood-soaked" pants, bra, and panties.

A responding paramedic noted that the victim was "[v]ery cold"—hypothermic with a body temperature of 81 degrees—and her blood pressure was so low that the paramedic was unable to obtain a reading. A doctor who treated the victim at the hospital confirmed that she arrived there in handcuffs and with unstable vital signs, a "completely" fractured bone in her jaw, "multiple" gunshot wounds and lacerations, "and a bruise all over her body."

Defendant testified on his own behalf consistent with the defense theory. The jury returned the verdicts indicated above.

## II. ANALYSIS

### A. PROPENSITY EVIDENCE

Defendant first argues that the trial court abused its discretion by admitting evidence of prior acts of domestic violence perpetrated by defendant against the victim. We disagree.

"We review for an abuse of discretion a trial court's decision to admit or exclude evidence," reviewing any preliminary legal questions of admissibility de novo. *People v Mann*,

288 Mich App 114, 117; 792 NW2d 53 (2010). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes," *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011), or when its decision is premised on an error of law, *People v Al-Shara*, 311 Mich App 560, 566; 876 NW2d 826 (2015). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Cameron*, 291 Mich App 599, 608; 806 NW2d 371 (2011) (quotation marks and citation omitted).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The general policy underlying MRE 404(b) is that propensity evidence—i.e., proof of a "defendant's inclination to wrongdoing in general"— should not be used as proof that the defendant committed a specific charged offense. *People v VanderVliet*, 444 Mich 52, 63; 508 NW2d 114 (1993), amended on other grounds 445 Mich 1205 (1994). Propensity evidence is inadmissible under MRE 404(b) not because it *lacks* legal relevance (i.e., probative value); rather, the fear is that a jury will view it as *too* probative, affording it undue weight. *Id.* at 62 n 11.

In certain instances, however, MCL 768.27b "expands the admissibility of domestic-violence other-acts evidence beyond the scope" ordinarily permitted by MRE 404(b). *People v Mack*, 493 Mich 1, 2; 825 NW2d 541 (2012). In particular, "in cases of domestic violence, MCL 768.27b permits evidence of prior domestic violence in order to show a defendant's character or propensity to commit the same act." *People v Railer*, 288 Mich App 213, 219-220; 792 NW2d 776 (2010). MCL 768.27b clearly applies to the facts at bar here,[1] and consequently the only relevant inquiry is whether the "other acts" evidence was inadmissible under MRE 403. See *People v Pattison*, 276 Mich App 613, 615; 741 NW2d 558 (2007).

For these purposes, the inquiry under MRE 403[2] involves two steps. *Cameron*, 291 Mich App at 611. "First, this Court must decide whether introduction of [the] prior-bad-acts evidence

---

[1] The victim, as defendant's wife and the mother of one of his children, qualifies as a "family or household member" as defined by MCL 768.27b. Further, defendant was charged with "an offense involving domestic violence" as defined by MCL 768.27b. See *Railer*, 288 Mich App at 220 (holding that a charge of assault with intent to do great bodily harm against the defendant's girlfriend qualified as an offense involving domestic violence under MCL 768.27b). Moreover, the "other acts" evidence in question—evidence that defendant had physically abused the victim within two weeks of the incidents at issue in this case—also qualifies as "an offense involving domestic violence" as that phrase is defined under MCL 768.27b.

[2] MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

-4-

at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice." *Id*. (quotation marks and citation omitted). When balancing the probative value of evidence of prior bad acts against the danger of unfair prejudice, a court must be cognizant that "[p]ropensity evidence is prejudicial by nature[.]" *People v Watkins*, 491 Mich 450, 486; 818 NW2d 296 (2012). However, MRE 403 "does not prohibit prejudicial evidence; only evidence that is unfairly so." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Id.* Importantly, because MCL 768.27b permits evidence of other acts to be used as proof of propensity to commit the charged offense, the propensity inference weighs "in favor of the evidence's probative value rather than its prejudicial effect." See *Watkins*, 491 Mich at 487 (construing a sister provision, MCL 768.27a, which regards propensity evidence in cases involving certain sexual offenses against minors).

Turning to the facts of this case, we discern no unfair prejudice from the challenged "other acts" evidence. At trial, both defendant and defense counsel openly admitted that defendant committed aggravated domestic violence on the evening in question, punching the victim in the face several times with sufficient force to split her skin and leave her with significant bruising. In other words, defendant's own theory of the case recognized his propensity to commit acts of domestic violence against the victim. Evidence that he committed a less drastic assault against her 11 days before the incident at issue here therefore bore little prejudice to defendant. On the contrary, in some ways it tended to *support* defendant's version of events. By showing that defendant had previously committed acts of domestic violence against the victim without causing her severe physical harm, the challenged evidence tended to suggest that he had a propensity to commit minor acts of domestic violence against her, not the sort of extreme acts of violence and torture of which he was accused. Moreover, on cross-examination, the victim acknowledged that for the approximately 10 years that they were married and living together, defendant did not physically abuse her. On this record, we see little risk that the challenged propensity evidence would have been afforded undue or preemptive weight by the jury.

Furthermore, any danger of unfair prejudice was outweighed by the evidence's probative value. At root, this case came down to a credibility contest between defendant and the victim. Evidence that defendant had admittedly committed acts of domestic violence against the victim—and threatened that he might assault her again if she was untruthful—within two weeks of committing the charged offenses was probative of whether he might have committed more serious acts of domestic violence if he believed the victim had lied to him. For purposes of this analysis, this propensity inference weighs in favor of admissibility, not against it. Therefore, the trial court's decision to admit the challenged evidence did not constitute an abuse of discretion. On the contrary, it fell within the range of reasonable and principled outcomes.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that there was insufficient evidence for any rational juror to decide that the prosecution had proven the intent elements of torture, unlawful imprisonment, assault with intent to do great bodily harm, and felony-firearm beyond a reasonable doubt. We disagree.

"A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo[.]" *People v Gaines*, 306 Mich App 289, 306; 856 NW2d 222 (2014). All record evidence must be viewed in the "light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

> The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. [*People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted).]

An inference founded upon another inference can be drawn in support of the jury's verdict, and "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Defendant contends that there was insufficient evidence of intent to support his torture conviction. We disagree. Viewing the evidence in the light most favorable to the prosecution, and drawing all credibility determinations in the prosecution's favor, the victim's testimony is dispositive. She testified (1) that defendant intentionally aimed his loaded handgun at her leg and shot her, causing her to temporarily lose the ability to use her legs or walk, (2) that he later intentionally scarred her breasts by cutting them with a knife, (3) that he intentionally struck her in the head (indeed, defendant admitted as much), thereby "completely" fracturing a bone in her jaw, (4) that he intentionally inflicted severe cuts on her, (5) that he intentionally inflicted multiple puncture wounds on her legs, and (6) that he intentionally sat on her chest and strangled her. From such testimony, a rational juror could reasonably infer both that defendant intentionally inflicted "great bodily injury" upon the victim (as that phrase is defined by MCL 750.85(2)(c)) and that he did so with the intent to cause her "cruel" or extreme physical or mental pain and suffering. Hence, there was sufficient evidence of intent to sustain defendant's torture conviction. See MCL 750.85; *People v Schaw*, 288 Mich App 231; 791 NW2d 743 (2010). See also M Crim JI 17.36.

Contrary to defendant's arguments on appeal, there was also sufficient evidence of intent to support his unlawful imprisonment conviction. The intent element of unlawful imprisonment requires proof that the defendant "knowingly" restrained a person (as the verb "restrain" is statutorily defined by MCL 750.349b(3)(a)). *Railer*, 288 Mich App at 217. The victim testified that defendant handcuffed her to her seatbelt without her consent, and defendant admitted as much. From such testimony, a rational juror could infer that defendant knowingly and forcibly restricted the victim's movements. A rational juror could also infer that defendant knowingly and forcibly confined the victim so as to interfere with her liberty without consent or lawful authority. Thus, there was sufficient evidence of intent to support defendant's conviction of unlawful imprisonment.

Likewise, there was ample evidence for a rational juror to conclude that the prosecution had proven the intent element of assault with intent to do great bodily harm beyond a reasonable

doubt. Assault with intent to do great bodily harm requires the "intent to do great bodily harm less than murder," which this Court has defined as "intent to do serious injury of an aggravated nature." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016) (quotation marks and citations omitted). Again, standing alone, the victim's testimony is dispositive. Crediting her testimony about the brutal acts of violence defendant committed against her, a rational juror could infer that defendant intended the natural consequences of such actions—i.e., the infliction of serious injury of an aggravated nature on the victim. Accordingly, there was sufficient evidence of intent to support defendant's assault with intent to do great bodily harm conviction.

We similarly reject defendant's claim that there was insufficient evidence to support his felony-firearm conviction. The intent element for felony-firearm is "knowing possession" of a firearm during the commission or attempted commission of the predicate felony.[3] *People v Rapley*, 483 Mich 1131 (2009). Defendant admitted that he knowingly possessed his handgun throughout the incident at issue in this case, which included his commission of assault with intent to do great bodily harm. Thus, there was sufficient evidence for a rational juror to conclude that defendant had the requisite intent to support his felony-firearm conviction.

## C. SENTENCING

Defendant argues that the sentences imposed for his convictions are unreasonable and disproportionate under the *Milbourn*[4] principle of proportionality standard. Defendant also argues that his minimum sentences constitute cruel and unusual punishment under the Eighth Amendment and under Article 1 of the 1963 Michigan Constitution. We disagree in both respects.

"This Court reviews the proportionality of a trial court's sentence for an abuse of discretion." *People v Foster*, 319 Mich App 365, 375; 901 NW2d 127 (2017). On the other hand, because it is unpreserved, this Court reviews defendant's cruel-and-unusual-punishment claim for plain error affecting defendant's substantial rights.[5] *People v Costner*, 309 Mich App 220, 232; 870 NW2d 582 (2015).

---

[3] Defendant's amended felony information listed three alternative predicate felonies for his felony-firearm conviction, one of which was assault with intent to do great bodily harm.

[4] *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

[5] As explained in *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999):

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding

It is undisputed that defendant's challenged sentences are within the properly scored sentencing guidelines. Therefore, they are "presumptively neither severe nor unfairly disparate." *People v Lee*, 243 Mich App 163, 187; 622 NW2d 71 (2000) (quotation marks and citation omitted). See also *People v Steanhouse (On Remand)*, 322 Mich App 233, 238; 911 NW2d 253 (2017).[6] Moreover, the facts of this case fully support the trial court's sentencing decisions as being " 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Id.*, quoting *Milbourn*, 435 Mich at 636.

For similar reasons, defendant's cruel-and-unusual-punishment challenge necessarily fails under plain-error review. The Michigan Constitution "prohibits the infliction of cruel *or* unusual punishment," *People v Tucker*, 312 Mich App 645, 654; 879 NW2d 906 (2015), while the "Eighth Amendment of the United States Constitution prohibits the infliction of cruel *and* unusual punishment," *id.* at 654 n 5. Hence, our state constitution provides broader protection, and "if a particular punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id.* (quotation marks and citation omitted). "In deciding if punishment is cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, comparing the punishment to the penalty imposed for other crimes in this state, as well as the penalty imposed for the same crime in other states." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011).

"A sentence within the guidelines range is presumptively proportionate, and a proportionate sentence is not cruel or unusual." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). Defendant simply announces that his sentences were cruel or unusual because his actions were not particularly heinous. That is not so. The victim was fortunate to survive. When paramedics arrived, she was suffering from hypothermia and lacked measurable blood pressure. Indeed it is difficult to think of anything additional, other than actually killing her, that defendant might have done to make his actions against the victim more reprehensible. On the scale of criminal culpability, this is one of the worst "domestic violence" cases imaginable. It involved a 17-hour torture spree. In fact, many homicides are arguably *less* heinous than defendant's actions in this case. Were it not for Officer Kolar's timely intervention,

---

whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [Quotation marks, citations, and brackets omitted.]

[6] Although there may be a split of authority on whether this Court has authority to review the proportionality of a within-the-guidelines sentence absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence, compare *People v Schrauben*, 314 Mich App 181, 196 n 1; 886 NW2d 173 (2016), with *Steanhouse (On Remand)*, 322 Mich App at 238 n 3, we need not resolve the conflict in this case because defendant has presented no unusual circumstances that would render the presumptively proportionate sentence disproportionate.

the victim would most likely have died, and defendant would be serving a much longer sentence: life without the possibility of parole. For those reasons, we reject defendant's argument that his minimum sentences were plainly cruel or unusual.

## D. EFFECTIVE ASSISTANCE OF COUNSEL

In supplemental briefing, including a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4 ("Standard 4 brief"), defendant raises several claims of ineffective assistance of counsel. We find each meritless.

Whether defense counsel performed ineffectively is a mixed question of law and fact. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Because there has been no *Ginther*[7] hearing, "our review is limited to the facts on the record." *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). We review de novo questions of constitutional law. *Trakhtenberg*, 493 Mich at 47.

A "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). As explained in *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012):

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. [Citations omitted.]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland*, 466 US at 689.

Defendant contends that he was denied adequate opportunity to meet with his attorney before trial, further contending that this lack of contact with his attorney during the "critical" pretrial stage constitutes the sort of structural error contemplated in *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984). Thus, defendant posits, he can succeed on a claim of ineffective assistance of counsel without any need to satisfy the second prong of the *Strickland* test for ineffective assistance (i.e., a reasonable probability of a different outcome but for counsel's deficient performance). Based our Supreme Court's recent decision in *People v Lewis*, 501 Mich 1; 903 NW2d 816 (2017), defendant's reliance on *Cronic* is misplaced.

---

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Defendant relies on a portion of *Cronic* in which the United States Supreme Court noted that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," the most notable of which is "the complete denial of counsel" "at a critical stage" of the proceedings. *Cronic*, 466 US at 658-659. The *Cronic* Court further noted that, in certain circumstances, "a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-660.

As explained in *Lewis*, 501 Mich at 6-8, however, such statements in *Cronic* were hypothetical musings about situations not before the Court in that case, and thus they constituted dicta. Those statements of dictum were also "clearly incompatible" with the earlier decision in *Coleman v Alabama*, 399 US 1; 90 S Ct 1999; 26 L Ed 2d 387 (1970), in which a majority of the Supreme Court, after deciding that a preliminary hearing was a "critical stage" of the proceedings, held that harmless-error review was appropriate despite the fact that the defendant had been deprived of counsel entirely at his preliminary hearing. *Lewis*, 501 Mich at 6-7. Because the relevant statements in *Cronic* were dicta, whereas the pertinent holding in *Coleman* was binding, our Supreme Court held that it was obliged to follow *Coleman* and hold that the deprivation of counsel at a critical pretrial proceeding "is subject to harmless-error review under the federal Constitution." *Lewis*, 501 Mich at 9.

Defendant offers no harmless-error analysis here, instead contending that under the *Strickland* test for ineffective assistance, he is entitled to a presumption that he was prejudiced by his counsel's alleged failure to adequately consult with him before trial. In our view, that argument runs directly contrary to the rule of law announced in *Lewis*, and thus we must reject it. See *People v Crockran*, 292 Mich App 253, 256-257; 808 NW2d 499 (2011) ("[O]nly the Supreme Court has the authority to overrule its own decisions. Until it does so, all lower courts and tribunals are bound by that prior decision and must follow it") (quotation marks and citations omitted). Moreover, by failing to address whether the alleged pretrial denial of counsel in this case constituted harmless error under *Lewis*, defendant has abandoned any such argument. See *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004).[8]

Defendant next argues that his trial counsel performed ineffectively by failing to request jury instructions regarding the defense of accident as it related to the charge of assault with intent to do great bodily harm.[9] This claim of error merits no relief.

---

[8] Moreover, when analyzed under the *Strickland* test for ineffective assistance, defendant's instant claim of error fails. Defendant has provided no basis for concluding that there is a reasonable probability that, but for counsel's failure to consult with defendant more often before trial, the outcome of the proceedings would have been different.

[9] To the extent defendant asserts that his counsel failed to argue that the shooting was accidental, that claim is belied by the record. As plaintiff correctly notes, during closing argument, counsel did, in fact, argue that the intoxicated, suicidal defendant did not intend to shoot the victim, but rather shot her accidentally when she tried to pull the gun away from his pointing it at his own head as he drove.

"Failing to request a particular jury instruction can be a matter of trial strategy," *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013), and in light of the jury instructions that were provided in this case, defendant had little to gain by requesting an instruction concerning accident. Because the jury was instructed that, to convict defendant of assault with intent to do great bodily harm, it had to find beyond a reasonable doubt that, among other things, "defendant intended to cause great bodily harm," an accident instruction would have added little of value to the defense. By nature, an accidental (i.e., unintentional) shooting is one that is *not* committed with the intent to cause great bodily harm to the victim. Thus, an accident instruction would have been redundant.

But even assuming, arguendo, that counsel should have requested an accident instruction and further assuming that defendant would have been entitled to one, on this record defendant cannot demonstrate any reasonable probability of a different outcome but for counsel's failure to do so. This is true for two primary reasons.

First, "jurors are presumed to follow their instructions," *People v Henry*, 315 Mich App 130, 150; 889 NW2d 1 (2016), and the jury was instructed that it could only convict defendant of assault with intent to do great bodily harm if it found beyond a reasonable doubt that he acted with the intent to cause great bodily harm to the victim. Thus, defendant cannot establish a reasonable probability that an accident instruction would have changed the jury's verdict. Had the jury believed that the victim's injuries were sustained by accident, it could not have found him guilty of assault with intent to do great bodily harm.

Second, defendant's argument rests on the presupposition that his conviction for assault with intent to do great bodily harm must have been based on the shooting alone. That is not so. The evidence presented at trial indicated that, *after* shooting the victim, defendant took her to an empty field where he intentionally lunged at her with a pocketknife, stabbed her in the hands and legs, sat on her chest and strangled her, scarred her breasts by cutting them with a knife, and struck her in the head forcefully enough to "completely" fracture a bone in her jaw. Medical evidence corroborated the appalling nature of the wounds suffered by the victim. Based on such evidence, even if the jury believed that defendant initially shot the victim by accident, it could have convicted him of assault with intent to do great bodily harm for his *subsequent* acts of violence against her. Defendant does not contend—and cannot on this record—that there was any evidence that the victim's other wounds, aside from the gunshot wounds, resulted from some accident. He therefore cannot establish a reasonable probability of a different outcome but for counsel's failure to request an accident instruction.

Next, defendant contends that trial counsel performed ineffectively by failing to challenge a specific juror for bias or excuse her via a peremptory challenge. Specifically, defendant argues that because a juror indicated during voir dire that she had previously been in an abusive relationship and had family members who were then embroiled in such relationships, counsel should have challenged her on grounds of bias or excused her by using a peremptory challenge. We conclude that defendant has failed to rebut the strong presumption that counsel's decision concerning this juror was both strategic and effective.

Because of the inherently subjective nature of jury selection, which is more art than science, this Court ordinarily refrains from second-guessing counsel's decisions concerning

prospective jurors. See, e.g., *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008). "Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions. However, as a reviewing court, we 'cannot see the jurors or listen to their answers to voir dire questions.' " *Id*. (citation omitted), quoting *People v Robinson*, 154 Mich App 92, 94; 397 NW2d 229 (1986). "Of all the important communications between human beings, at least 50% is nonverbal." *Robinson*, 154 Mich App at 95 (quotation marks and citation omitted). "A lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury. Defense counsel may want to retain certain prospective jurors, especially, and be willing to express satisfaction so the prosecution will not or cannot eliminate them." *Id*. Counsel may conclude that the juror in question is better than the potential replacement prospects, decide that his peremptory challenges are better used on others, believe that a former victim of domestic violence might be receptive to a defense theory concerning a suicide pact, or believe that the potential juror's other factors may make her a sympathetic juror or preferable in some other way. Moreover, counsel may be rightfully concerned that, should he unsuccessfully challenge a juror for cause, "that unsuccessful challenge[] . . . would not be viewed favorably by the jury." *Id*. at 94. In the instant case, the juror in question testified that she could put all of her experiences aside and judge the case solely on the evidence that would be introduced. Based on the juror's assurances and the lack of any evidence that the juror was in fact biased, we see no reasonable probability of a different outcome. *Strickland*, 466 US 668 at 694.

Finally, in his Standard 4 brief, defendant argues that his two retained trial attorneys performed ineffectively by failing to file a pretrial motion seeking a competency examination of defendant. Defendant posits that counsels' deficient performance in this regard entitles him to a new trial.[10]

This claim of error is fatally flawed at the outset. Under MCL 330.2020(1), defendant is presumed to have been competent to stand trial, and he cites no record evidence establishing that he was not. Nor does defendant cite any record evidence indicating that he was legally insane at the time he committed the offenses of which he was convicted. See generally MCL 768.21a; *People v Carpenter*, 464 Mich 223, 230; 627 NW2d 276 (2001) (discussing the insanity defense and MCL 768.21a). Finally, defendant has presented no evidence of what investigation his retained trial attorneys performed with regard to his mental health. Absent such evidence, there is no basis for concluding that their performance fell below an objective standard of reasonableness under prevailing professional norms, or that, had they obtained a competency examination, there would have been a reasonable probability of a different outcome. Indeed, defendant does not even *argue* that there would have been a reasonable probability of a different

---

[10] Defendant continues to argue in his Standard 4 brief that this Court should remand for a *Ginther* hearing. Defendant's motion to remand has already been considered and denied by this Court, *People v Muntean*, unpublished order of the Court of Appeals, entered September 11, 2018 (Docket No. 334952), and we agree that he has failed to make the requisite showing to warrant remand under MCR 7.211(C)(1)(a). We therefore similarly deny his remand request.

outcome. Consequently, defendant has failed to carry his burden with respect to this issue, and we must reject his claim of error.

Affirmed.


/s/ Jane M. Beckering
/s/ Michael J. Riordan
/s/ Thomas C. Cameron