*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAVID EDWARD TYLER III,

Defendant-Appellant.

UNPUBLISHED
July 28, 2022

No. 330462
Kalamazoo Circuit Court
LC No. 2015-000733-FH

Before: BORRELLO, P.J., and MARKEY and M. J. KELLY, JJ.

PER CURIAM.

Defendant, David Edward Tyler III, was convicted by a jury of aggravated assault, MCL 750.81a(1); assault with intent to do great bodily harm less than murder, MCL 750.84; first-degree home invasion, MCL 750.110a(2); and unlawful imprisonment, MCL 750.349b. Because of his conviction for unlawful imprisonment, he was required to register as a sex offender under the Sex Offender Registration Act (SORA), MCL 28.721 *et seq.* For the reasons stated in this opinion, we affirm his convictions and sentence, but remand for entry of an order removing Tyler from the sex offender registry.

## I. BASIC FACTS

Tyler and Amber Dominguez started dating in October or November of 2014. On May 18, 2015, Tyler arrived at Dominguez's place of work with Dominguez's children—a three-year-old and a four-year-old—and offered her a ride home. Dominguez declined because of an ongoing argument with Tyler and because she had already arranged for someone else to give her a ride. Tyler became upset and left. At approximately 11:00 p.m., Dominguez's friend, Darius Greer, dropped her off at the corner of her street so that Tyler would not see who drove her home. Although Tyler was in the apartment when Dominguez arrived, he was still upset and he left a short time later.

As the evening progressed, Tyler and Dominguez exchanged text messages. Dominguez indicated that she was going to break up with him. Tyler stated that he was going to kill himself because of the break up and he sent her a picture of himself on a balcony from which he was going

-1-

to jump. Dominguez called the police to assist Tyler. She also called Greer to come to her apartment and sit with her. Greer arrived at approximately 2:00 or 2:30 a.m.

Around 3:50 a.m., Tyler arrived at the apartment and let himself in with a key. Dominguez immediately called the police, but Tyler stated that if she did not hang up he would harm her. After she hung up, he came toward her and she ran to her children's bedroom. Greer, who was on the couch, recounted that Tyler chased after Dominguez with a "blade" in his hand. There was a physical altercation between Tyler and Dominguez in the bedroom. Greer testified that he grabbed Tyler's arm and told him to stop. Tyler, however, cornered Dominguez against the wall. He eventually ended up on top of Dominguez while she was lying on one of the children's beds. Greer stated that Tyler pointed his knife at Dominguez and that when he tried to grab Tyler to stop him, Tyler turned and slashed at him. Greer grabbed the knife by the blade, cutting the tendons in his fingers in the process. After a struggle over the knife, Tyler stabbed Greer in the chest. Greer kicked Tyler off of him. Tyler then chased Dominguez. Greer responded by tackling Tyler against the closet. Tyler hit Greer in the back of the head with the blade of the knife, and Greer fell to the floor.

Realizing that he was losing a lot of blood, Greer left the apartment, called the police, and tried to drive himself to the hospital. Instead, he blacked out. The police were able to find him in his vehicle and get him medical attention.

Meanwhile, Dominguez and her children were still in the apartment with Tyler. Dominguez tried to get her children out through the window in her bedroom. However, Tyler picked her up and threw her into the wall. She landed on the floor and he climbed on top of her and placed the knife to her throat. Dominguez was afraid he was going to kill her, but she asked Tyler if she could put the children outside. Tyler agreed and Dominguez and the children left the apartment through the window. Tyler followed them. Dominguez then asked Tyler if she could bring the children to her neighbor's apartment. Tyler agreed, but insisted on accompanying them.

When the neighbor opened the door, Dominguez and her children hurried in and slammed the door shut. She fled with them into a bathroom. Her neighbor engaged the deadbolt on the door. The neighbor testified that Tyler then crashed through the window. He stated that Tyler pushed him to the ground before pursuing Dominguez into the bathroom.

In the bathroom, Tyler got on top of Dominguez and her son. He was pointing the knife at Dominguez and repeatedly telling her that she had lied to him. Dominguez grabbed the blade of the knife, cutting her fingers. She then asked Tyler if they could go into a bathroom with less blood. Tyler agreed and Dominguez, her children, and Tyler moved to another bathroom. Dominguez testified that Tyler told them that they were going to be hostages. He made Dominguez and the children sit on his lap while he rested the knife on Dominguez's shoulder. Eventually the police arrived and, after several minutes, were able to convince Tyler to release the children. Approximately two hours later, Tyler agreed to release Dominguez. Thereafter, he surrendered to law enforcement.

At trial, Tyler testified that he became sad when Dominguez talked about ending the relationship, so he eventually started sending her messages indicating that he was going to kill himself. He decided that if he could talk to Dominguez he could "smooth things out." Before

going to her apartment, however, he attempted to purchase alcohol, but when he was unable to do so, he bought a knife instead. He testified that he bought the knife so he could cut himself as a coping method for his depression. Tyler stated that when he entered the apartment the knife was in his pocket. He followed her to the bedroom, where the knife fell out of his pocket. Tyler explained that Greer ran in and was stabbed or cut accidentally after he started wrestling with Tyler. Tyler was also cut during the struggle, and he recounted that Greer eventually walked out of the room "like everything was fine."

Tyler testified that he went after Dominguez, gave her the knife, and followed her and her children out of the bedroom window and to the neighbor's apartment. He became upset when the door was closed on him, so he went through the window. Tyler explained that he just wanted to talk to Dominguez. In the bathroom, he claimed to see his knife lying on the ground so he put it into his pocket. He stated that they went to the second bathroom because he was bleeding. According to Tyler, while they were in the second bathroom, Dominguez shut the door and sat on his lap, the children were not upset, and he did not threaten Dominguez with the knife. Instead, he removed the knife from his pocket and slid it across the floor. He explained to the jury that when the police arrived, the barking of the dogs scared Dominguez's daughter, so he told the police not to come any closer. He confirmed that the children left after 10 or 20 minutes, but he stated that Dominguez voluntarily stayed because she was worried he would kill himself.

The jury found Tyler guilty of aggravated assault with respect to Greer, assault with intent to do great bodily harm less than murder with respect to Dominguez, first-degree home invasion, and unlawful imprisonment. This appeal follows.[1]

## II. SENTENCE—OFFENSE VARIABLES

### A. STANDARD OF REVIEW

Tyler argues that he is entitled to resentencing because the trial court erred by scoring 25 points for offense variable (OV) 1, 25 points for OV 3, 10 points for OV 19, and 5 points for OV 10. The trial court's factual determinations are reviewed for clear error and must be supported by

---

[1] The procedural history of this case mirrors that of *People v Lymon*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 327355). Briefly, we note that this case, like *Lymon*, was held in abeyance pending our Supreme Court's decision in *People v Bosca*, 310 Mich App 1; 871 NW2d 307 (2015). As explained fully in *Lymon*, ___ Mich App at ___; slip op at 10-11, the Supreme Court held its decision in *Bosca* in abeyance pending the decision in *People v Temelkowski*, 307 Mich App 241; 859 NW2d 743 (2014). *People v Bosca*, 872 NW2d 492 (2015). After *Temelkowski* was resolved, the Supreme Court entered a second order holding *Bosca* in abeyance pending the decisions in *People v Tucker*, 312 Mich App 645; 879 NW2d 906 (2015) and *People v Snyder*, unpublished per curiam opinion by the Court of Appeals, issued February 18, 2016 (Docket No. 325449). *People v Bosca*, 911 NW2d 465 (2018). After resolving those cases, the Supreme Court entered an order in *Bosca*, reversing part XIII of this Court's opinion in *Bosca* and remanding for further proceedings consistent with the Supreme Court's decision in *People v Betts*, 507 Mich 527, 533-536; 968 NW2d 497 (2021). *People v Bosca*, 969 NW2d 55 (2022).

a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438, 835 NW2d 340 (2013). The court's application of the facts to the law is reviewed de novo. *Id*. "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Brooks*, 304 Mich App 318, 319-320; 848 NW2d 161 (2014) (quotation marks and citation omitted).

## B. ANALYSIS

### 1. OV 1

The trial court scored OV 1 at 25 points. OV 1 addresses the aggravated use of a weapon. MCL 777.31. The court must score 25 points if "a victim was cut or stabbed with a knife or other cutting or stabbing weapon." MCL 777.31(1)(a). Tyler argues that a 25-point score was not warranted because Dominguez's injuries were self-inflicted. In support, he directs this Court to Dominguez's testimony that she was cut when she instinctively grabbed the knife he was pointing at her. He notes that her testimony shows that she was cut *by* a knife, but that a 25-point score requires a finding that she was cut *with* a knife. The evidence, however, shows that Dominguez cut herself with the knife when she grabbed it by the blade. Tyler also argues that, in order to score 25 points, the trial court had to find that he, not Dominguez, was the person who cut Dominguez with a knife. Again, however, the record shows that Tyler brought the knife, cut or stabbed Greer with it during the initial altercation in Dominguez's apartment, and then used it to threaten Dominguez in the bathroom of her neighbor's apartment. Dominguez, therefore, was cut with the knife because Tyler was threatening her with it. Nothing in the statutory language precludes scoring 25 points merely because the victim was cut with a knife while attempting to disarm his or her attacker. The trial court did not err by scoring 25 points for OV 1.

### 2. OV 3

Tyler next argues that 25 points should not have been scored under OV 3. OV 3 addresses physical injury to a victim. MCL 777.33(1). The court must score 25 points if a "[l]ife threatening or permanent incapacitating injury occurred to a victim." MCL 777.33(1)(c). Here, the sentencing offense was first-degree home invasion, which occurred after Tyler assaulted Dominguez and Greer in Dominguez's apartment. Under the sentencing guidelines, the OVs "are generally offense specific." *People v Sargent*, 481 Mich 346, 348; 750 NW2d 161 (2008). Thus, unless a specific OV states otherwise, "only conduct that relates to the offense being scored may be considered." *Id*. Thus, in this case, as conceded by the prosecution, the trial court erred by scoring 25 points for OV 3 based on Tyler's infliction of a life-threatening injury on Greer. As it relates to the sentencing offense, the only injury that occurred was to Dominguez and it was a "[b]odily injury requiring medical treatment," MCL 777.33(1)(d), so a score of 10 points, not 25 points was warranted under OV 3.

### 3. OV 9

Tyler also contends that OV 9 was improperly scored. OV 9 addresses the number of victims. MCL 777.39. Ten points must be scored if "[t]here were 2 to 9 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(c). Each person "who was placed in danger of physical injury or loss of life or property" must be counted as a victim. MCL 777.39(2).

-4-

Here, the record supports the court's scoring decision. After being locked out of the apartment of Dominguez's neighbor, Tyler crashed through the window. He pushed the neighbor to the floor. Although the neighbor was not injured, he was certainly placed in danger of a physical injury as a result. It is not uncommon or unheard of for individuals to sustain physical injuries during a fall. Moreover, Dominguez was placed in danger of physical injury or loss of life when Tyler followed her into the bathroom and threatened her with a knife. As described by Dominguez, the altercation in the bathroom resulted in Tyler getting on top of her and her son. Dominguez's other child was also in the room and, given Tyler's actions, it is plain that Dominguez and her children were both in danger of being physically injured by Tyler, who had pursued them into the bathroom while wielding a knife and who had gotten on top of Dominguez and her very young child. We conclude that Dominguez, her neighbor, and her two children were all placed in danger of physical injury during the home-invasion. The trial court, therefore, did not err by scoring OV 9 at ten points.

### 4. OV 10

Finally, Tyler asserts that OV 10 was improperly scored at 5 points. OV 10 address exploitation of a vulnerable victim. MCL 777.40. The court must score 5 points if "[t]he offender exploited a victim by his or her difference in size or strength, or both . . . ." MCL 777.40(1)(c). "Exploit" means to "manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). "Vulnerability" means "the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c). Yet, the mere existence of a difference in size or strength, "does not automatically equate with victim vulnerability." MCL 777.40(2). Tyler asserts that there was nothing to show that he was "physical" in order to maintain or keep Dominguez in the bathroom. On appeal, the prosecution contends that because of Tyler's size and strength, he was able to hold the smaller, physically weaker victims captive and that the victims were also more susceptible to injury than if they were all the same size and strength. Yet, the prosecution does not direct us to any evidence in support of that contention, other than the fact that Tyler was bigger and stronger than his victims. Indeed, based on our review of the record, it is apparent that Tyler did not use his size and strength advantage to exploit his victims. Instead, he used a knife. The court, therefore, erred by scoring OV 10 at five points.

### 5. NEED FOR RESENTENCING

The trial court scored the guidelines for Tyler's first-degree home invasion conviction, which is a Class B offense. See MCL 777.16f. Although the trial court erroneously scored OV 3 at 25 points instead of 10 and OV 10 at five points instead of zero, the scoring error does not entitle Tyler to resentencing because it does not affect the guidelines range under which he was sentenced. See *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006). For his home invasion conviction, he received a total of 110 OV points, which placed him at OV level VI. An offender who is convicted of a Class B offense is placed at OV level VI if he or she has 75 or more OV points. MCL 777.63. The deduction of the 20 improperly scored OV points only reduces Tyler's OV points from 110 to 90, but does not change his OV level. Resentencing, therefore, is not warranted. See *Francisco*, 474 Mich at 89 n 8.

## III. PUNISHMENT INCREASED BY JUDICIAL FACT-FINDING

## A. STANDARD OF REVIEW

Tyler argues that, although he was convicted of one count of unlawful imprisonment based on his conduct, the jury's verdict does not disclose whether it found him guilty of unlawful imprisonment of Dominguez or one of her children. Because registration under SORA is only required for a conviction of unlawful imprisonment "if the victim is a minor," MCL 28.722(4)(*iii*), he argues that registration in this case is not supported by the jury verdict. Because he did not object to being placed on the sex offender registry on this basis, we review this issue for plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

## B. ANALYSIS

We conclude that the requirement that Tyler register as a sex offender violates his Sixth Amendment fundamental right to a jury trial. In *Apprendi v New Jersey*, 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000), the United States Supreme Court held that "[o]ther than the fact of a prior conviction, *any fact that increases the penalty for a crime* beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Emphasis added). Here, the statutory maximum prescribed for unlawful imprisonment is "imprisonment for not more than 15 years or a fine of not more than $20,000.00, or both." MCL 750.349b(2).[2] In addition, under SORA, an offender convicted of unlawful imprisonment is considered a Tier I offender, MCL 28.722(q) and (r)(*iii*), and must comply with the SORA, MCL 28.723. Specifically, a Tier I offender is required to register for a period of 15 years, MCL 28.725(10). That 15-year period excludes "any period of incarceration for committing a crime . . . ." MCL 28.725(14).

Previously, this Court held that because registration under SORA was a civil remedy, not a punishment, an order requiring an offender to register as a sex offender could not violate either the Michigan Constitution or the United States Constitution. See e.g., *People v Bosca*, 310 Mich App 1, 71-72; 871 NW2d 307 (2015), reversed in relevant part 969 NW2d 55 (2022). However, in *People v Betts*, 507 Mich 527, 533-536; 968 NW2d 497 (2021), our Supreme Court concluded that the prior version of SORA, 2011 PA 18, (the 2011 SORA) was a punishment, not a civil remedy. *Betts*, 507 Mich at 562. Thereafter, this Court concluded that, although the Legislature had amended SORA in 2020, see 2020 PA 295, effective March 24, 2021 (the 2021 SORA), registration under SORA continued to be a punishment, not a civil remedy. *Lymon*, ___ Mich App at ___; slip op at 18. Thus, registration under SORA is now recognized to be a punishment.

That increased punishment, i.e., registration under SORA, is statutorily authorized. However, as it relates to a conviction of unlawful imprisonment, SORA only authorizes the increase for unlawful imprisonment only if the victim of that offense "is a minor." MCL 28.722(r)(*iii*). Here, the fact that the victim is a minor has not been established beyond a reasonable doubt in this case. Instead, the jury was charged with a single count of unlawful imprisonment and was instructed that it could find that Tyler unlawfully imprisoned Dominguez or either of her

---

[2] Tyler was sentenced to 10 to 30 years, but the increase to the upper limits of his sentencing guidelines range was because he was a third-offense habitual offender. See MCL 769.11.

children. The jury was not asked to specify which victim it found Tyler guilty of unlawfully imprisoning. Nor is it reasonable to infer that the jury's verdict necessarily relied upon a finding that the victim was a minor. If the jury found that Tyler unlawfully imprisoned Dominguez, then registration under SORA is not statutorily authorized. If the jury found that Tyler unlawfully imprisoned either of Dominguez's children, then it would have necessarily found that he unlawfully imprisoned a minor. The registration requirements in SORA, therefore, were not authorized by the jury verdict, which failed to specify the identity of the victim. Instead, the requirement that Tyler register as a sex offender under SORA was triggered by an apparent judicial finding that Tyler's conviction "involved" minor children. Judicial factfinding of that nature is not sufficient to support a finding that increases the penalty for the offense. *Apprendi*, 530 US at 490. Therefore, the trial court committed plain error by requiring Tyler to register as a sex offender.

## IV. CRUEL AND/OR UNUSUAL PUNISHMENT

### A. STANDARD OF REVIEW

Finally, Tyler argues that the requirement that he register as a sex offender for his conviction of unlawful imprisonment is cruel and unusual punishment under the Eighth Amendment of the United States Constitution and cruel or unusual punishment under Michigan's 1963 Constitution. Because he did not raise this claim in the trial court, we review it for plain error affecting his substantial rights. *People v Burkett*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 351882); slip op at 2.

### B. ANALYSIS

A threshold inquiry when determining whether registration under SORA is or is not cruel and/or unusual punishment is that the registration requirement must, in fact, be a punishment. As noted above, our Supreme Court determined that registration under the 2011 SORA is a punishment, not a civil remedy, *Betts*, 507 Mich at 562, and this Court held that registration under the 2021 SORA is, likewise, a punishment, not a civil remedy, *Lymon*, ___ Mich App at ___; slip op at 18. Because the threshold requirement is satisfied, we consider whether requiring Tyler to register as a sex offender for his conviction of unlawful imprisonment is cruel or unusual punishment under Michigan's 1963 Constitution. We conclude that it does.

As recently explained by this Court:

> "The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const., Am VIII." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011) (emphasis added). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id*. (quotation marks and citation omitted). To determine whether a punishment is cruel or unusual, courts assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty

imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. *People v Bullock*, 440 Mich 15, 30, 33-34; 485 NW2d 866 (1992). [*Lymon*, ___ Mich App at ___; slip op at 18.]

In *Lymon*, the defendant was convicted of unlawfully imprisoning his wife and his two minor children, but there was no sexual component to his offense. *Id*. at ___; slip op at 18-19. Applying the above factors, this Court determined that the offense committed was "heinous" and "extremely disturbing." *Id*. at ___; slip op at 19. Yet, when weighing the gravity of the offense against the harshness of the penalty, this Court concluded that "registration under SORA results in punishment grossly disproportionate to the offense." *Id*. at ___; slip op at 20. In doing so, this Court considered that as a tier I offender, the defendant had to "meet the onerous reporting requirements" set forth in SORA. *Id*. And it noted that his failure to comply could result in him being convicted of additional crimes and subjected to additional incarceration or monetary penalties. *Id*. The onerous, affirmative obligations imposed by SORA include: (1) reporting requirements that arise even if there have been no changes in the registrant's life, reporting requirements that are triggered by normal life changes, and reporting requirements triggered by the registrant's decision to move to another state, travel to another country, or temporarily reside somewhere other than his place of residence; (2) requirements to maintain identification unless homeless; and (3) requirements to pay annual registration fees unless the registrant can show indigency. See *id*. at ___; slip op at 19, citing MCL 28.725(1)-(2), (8); MCL 28.724a; and MCL 28.725a(3) and (6)-(7). For a period of 15 years after he or she is released from incarceration, a Tier I offender will have to comply with each of the above affirmative obligations, and his failure to do so can result in him being convicted of additional felonies or misdemeanors. See MCL 28.729.

In addition to those obligations, a registrant who is required to register because of his conviction for a listed offense that lacks a sexual component and is not sexual in nature is subjected to an additional punishment in the form of unwarranted shaming. As it relates specifically to a Tier I offender, such as Tyler, the following personal information must be made available on a public website, "his name (legal, aliases, nicknames, ethnic or tribal names, and any other name); his date of birth; his address; the address of each of his employers and the address of the places where he is working; the address of any school that has accepted him as a student and that he plans to attend; his license plate number and a description of any vehicle he owns or operates; a summary of his convictions for listed offenses; a complete physical description; a photograph; and his registration status," and his internet identifiers may also be placed on the public website. See *Lymon*, ___ Mich App at ___; slip op at 19-20, citing MCL 28.728(2). The *Lymon* Court concluded that in light of the "social stigma that results from an individual being placed on a sexual offender registry," the defendant's placement

on the public registry is also a severe punishment because he has not been convicted of an offense that includes a sexual component. Simple logic compels the conclusion that an individual on the *sexual* offender registry has committed an offense with a *sexual* component, i.e., that he is a sexual offender. Here, because there is no sexual component to [the defendant's] offense, any negative consequences that he must face as a result of being publicly listed on a website purporting to identify sexual offenders, arises from his placement on the registry,

not from his underlying conviction. [*Lymon*, ___ Mich App at ___; slip op at 20 (footnotes omitted).]

Here, like the defendant in *Lymon*, Tyler was convicted of an offense that is not sexual in nature. Moreover, there was no sexual component to his conviction. His conviction was based upon his act of using a knife to confine Dominguez and her minor children to a bathroom. As punishment, he was sentenced to 10 to 30 years' incarceration. Registration under SORA, therefore, means that in addition to that not-insignificant sentence, he will have to comply with SORA's onerous reporting requirements for 15 years. During that period, he will be subjected to the social stigma of being placed on a *sex* offenders' registry despite having not committed an offense with a sexual component. Moreover, if he fails to comply with SORA, he will be subject to additional convictions and incarceration. We conclude that, under the facts of this case, when the gravity of the offense is weighed against the severity of the penalty imposed, it is clear that registration under SORA results in punishment that is grossly disproportionate to the offense.

Moreover, looking to the penalty imposed for the unlawful imprisonment of a minor compared to penalties imposed for other offenses in Michigan, *Bullock*, 440 Mich at 33, we agree with the *Lymon* Court's observation that "the majority of offenses that do not have a sexual component do not result in the offender being placed on the sexual offender registry." *Lymon*, ___ Mich App at ___; slip op at 20. The third factor stated in *Bullock* is also not helpful. That factor requires this Court to assess the penalty imposed for the commission of the offense in Michigan to that imposed for the same offense in other states. *Bullock*, 440 Mich at 34. Yet explained in *Lymon*, "each state's version of SORA appears to include both minor and major differences when compared to our version of SORA, [so] a comparison to the penalty imposed in other states does little to shed light on whether the penalty imposed" on an offender is cruel or unusual punishment. *Lymon*, ___ Mich App at ___; slip op at 21.

Finally, we conclude that the penalty imposed does not advance the goal of rehabilitation. In *Lymon*, this Court reasoned:

We find persuasive this Court's analysis on the rehabilitation that was stated in *People v Dipiazza*, 286 Mich App 137, 156; 778 NW2d 264 (2009). In that case, this Court held:

[I]t is abundantly clear that there is no goal of rehabilitation in this case. Defendant never posed a danger to the public or a danger of reoffending. Defendant is not a sexual predator, nor did the trial court deem him to be. Further, even if defendant needed rehabilitation, SORA's labeling him as a convicted sex offender works at an opposite purpose, preventing defendant from securing employment and otherwise moving forward with his life plans.

Likewise, in this case, there is nothing to suggest that the danger [the defendant] poses to the public is related to a sexual offense, nor is there anything to suggest that he will commit a sexual offense in the future. He is not a sexual predator. And, to the extent that he needs rehabilitation, labeling him as a sex offender, does not

> serve any rehabilitation goals related to his actual offense. [*Lymon*, ___ Mich App at ___; slip op at 21.]

Here, the record is devoid of evidence showing that Tyler is a sexual predator. Indeed, there is nothing suggesting that the danger he presents to the public is related to a sexual offense, nor is there support for a finding that he will commit a sexual crime in the future. And, as in *Lymon* and *Dipiazza*, labeling him a sex offender, will not serve any rehabilitation goals pertaining to his actual offense.

In sum, having considered each of the *Bullock* factors, we conclude that requiring Tyler to register as a sex offender for 15 years is cruel or unusual punishment because it is unjustifiably disproportionate to the offense he committed. As a result, remand for entry of an order removing Tyler from the sex offender registry is required.

Affirmed but remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Kelly